**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARK WORTH** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  16-3877** |
| | : | |
| **STEPHEN WORTH, *et al.*** | : | |

**<u>MEMORANDUM</u>**

**KEARNEY, J.**                                                              **November 29, 2016**

When equal co-owner brothers fight over perceived harm to their treasured family-owned corporation, lawyers and judges must move beyond the fraternal *animus* and work to resolve the dispute under Rule 1.  Brothers Mark and Stephen Worth have fought for years concerning their co-owned family corporation, Worth and Company, including for over nine months in an earlier state court case based on the same facts now filed in our limited jurisdiction.   Upon arriving here, both brothers retained new counsel who now attempt to turn back time to raise issues they could have raised almost a year ago before investing substantial dollars and time: Stephen moves to compel this case into arbitration and Mark moves to disqualify Stephen's counsel from also representing the Company. They never raised these threshold issues before arriving at this Courthouse. As neither thought these arguments had merit during the nine months of state court litigation, each has waived these arguments. In the accompanying Order, we deny both Stephen's motion to compel arbitration and Mark's motion to disqualify Stephen's counsel from also representing the Company.   It is time for lawyers and judges to go to work on resolving the dispute.

## I.    Background

Mark and Stephen Worth started Worth and Company, Inc. as a family-run business in the 1970s focusing on large scale HVAC and plumbing services for corporations, municipalities, and local governments.[1]  The brothers incorporated the Company in Pennsylvania in 1983 and later signed a Shareholders Agreement in 1994 to "reflect their agreements regarding the ownership, obligations, and conduct with respect to [Company]."[2]  The Company also signed the Shareholders Agreement. The Shareholders Agreement confirmed Mark and Stephen were equal 50% shareholders.[3]  The brothers agreed to restrict the sale or transfer of shares and required each to work as full time employees for the Company.[4]

The brothers agreed to arbitrate some but not all disputes:

> The Shareholders agree that in the event of a dispute or controversy concerning this Agreement, and/or their relationship to each other as Shareholders, such disputes or controversies shall be submitted to the arbitration of three (3) disinterested and competent arbitrators, whose decision shall be conclusive and binding upon the parties; provided, however, that this arbitration provision does not apply to matters relating to the operation and management of the Corporation, which matters are within the sole discretion of the Board of Directors and not subject to arbitration.[5]

The brothers agreed Stephen would serve as the Company's President and Chief Executive Officer and Mark would serve as Vice President.[6]  They remained the Company's only directors until they voted James A. Gillen, then the company's Chief Financial Officer, as the third director in 2003.[7]  Since 2003, Stephen and Mr. Gillen voted together on nearly every occasion.[8]  Giving rise to their present dispute, Stephen ordered Mark to stay away from the Company, not to interact with its employees, and not be involved with the Company.[9]

In response, Mark alleged: Stephen and the Company used his New Jersey HVAC license to bid on projects by forging Mark's signature[10]; Company's directors allegedly approved

2

exorbitant and improper pay packages for the Company's executives and awarded Stephen an interest free personal loan[11]; Stephen allegedly diverted Company funds to his other ventures in which Mark has no ownership interest, including to companies directly competing the Company[12]; Mark claims Stephen diverted Company funds to friends and family members who are at most tangentially involved with the Company's day-to-day operations[13]; Mark also claims Stephen failed to disburse funds from a tax refund check to Mark or allow Mark to access the Company's financial records[14]; and Gillen and other Company officers allegedly supported or assisted Stephen's efforts to harm the Company and him.

Mark first filed an individual and derivative suit against Stephen and the Company in state court. In state court, Mark alleged breach of fiduciary duty, unjust enrichment, minority shareholder oppression, and sought an accounting.[15] The parties actively litigated in state court for nine months. Their efforts included multiple sets of preliminary objections, objections to subpoenas and motions to compel.[16] The parties further entered into a stipulated confidentiality agreement. At no time did Stephen invoke arbitration under the Shareholders Agreement and Mark did not challenge Stephen's counsel also representing the Company. On June 18, 2016, Mark voluntarily discontinued his state court case.

Mark then hired new lawyers who sued Stephen, Ann Worth, James Gillen, Steven Stoughton, James Denning, and the Company individually and derivatively on behalf of the Company. Mark brings derivative claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") along with state law claims for breach of fiduciary duty, minority shareholder oppression, common law fraud, civil conspiracy, unjust enrichment, conversion, and a request for accounting. Stephen and the Company hired new lawyers and responded by

3

moving to compel arbitration under the Shareholders Agreement.   In turn, Mark moved to disqualify Stephen's counsel from also representing the Company.

At oral argument, Mark narrowed his claims after realizing almost all of his claims allege harm to the Company. As of today, Mark alleges derivative claims under RICO (Counts I, II) and breach of fiduciary duty of loyalty and conspiracy to breach fiduciary duties (Counts IV, VII).   He alleges individual harm for minority oppression under Pennsylvania's minority oppression statute including a request for records and a custodian (Counts V, XII) as well as damages for the funds represented by a tax refund check not forwarded to him (Counts IX, X).[17]

## II.     Analysis

### A.     We deny Stephen and the Company's motion to compel arbitration.

Defendants move to compel arbitration, citing the arbitration clause in the Shareholders Agreement.[18]    Mark argues the plain language of the arbitration clause excepts his derivative and individual claims from mandatory arbitration.   Mark also argues, even if the clause is applicable to his individual claims for minority oppression or converting his tax refund check, Stephen and the Company waived their right to arbitration by litigating the same issues for nine months in state court.  We agree and deny the motion to compel arbitration.

By enacting the Federal Arbitration Act ("Act"), Congress "expressed a strong federal policy in favor of resolving disputes through arbitration."[19]   In deciding whether to compel arbitration, we consider "(1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement."[20]  We do "not to examine the potential merits of the claim sought to be arbitrated," but instead limit our analysis "to the construction of the arbitration clause and any contractual provisions relevant to its scope, as well as any other 'forceful evidence' suggesting that the

parties intended to exclude the disputes at issue from arbitration."[21]    Our Court of Appeals and the Supreme Court instruct "[a]rbitration is strictly a matter of contract.  If a party has not agreed to arbitrate, the courts have no authority to mandate [arbitration]."[22]    The Supreme Court emphasizes we should not "distort the process of contract interpretation," when reading an arbitration clause.[23]  The Act "does not require parties to arbitrate when they have not agreed to do so...nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement."[24]

No party disputes the existence of an arbitration clause in the Shareholders Agreement. The issue is whether the arbitration clause covers any plead claim and if so, has Steven waived enforcing arbitration by litigating the same claim in state court for almost a year.

We first review whether any of Mark's remaining claims are within the scope of the arbitration agreement. Mark alleges derivative claims under RICO, for breach of fiduciary duty and conspiracy to breach fiduciary duties.  Shareholder derivative actions are brought "to enforce a corporate cause of action against officers, directors, and third parties" whose purpose was "to place in the hands of the individual shareholder a means to protect the interests of the corporation from misfeasance and malfeasance of faithless directors and managers."[25]  Moreover, a "claim pressed by the stockholder against directors or third parties is not his [or her] own but the corporation's."[26]    As we did at oral argument, we determine whether an action is individual or derivative in nature regardless of how Mark characterizes his claims.[27]  We review the factual allegations, stated injury, and relief sought in the complaint.[28]  We must determine whether the "gravamen of the complaint is injury to the corporation," and if "damages to a shareholder result indirectly, as the result of an injury to the corporation...the shareholder cannot sue as an individual."[29]

We found no case law from our Court of Appeals speaking directly on this topic, but both the Court of Appeals for the Second Circuit and the Pennsylvania Superior Court confirm shareholder derivative suits are arbitrable.[30]  We need not venture into this thicket as Mark and Stephen conveniently addressed this distinction in their arbitration clause.

Mark and Stephen agreed disputes concerning their Shareholders Agreement and their relationship to each other as Shareholders would be arbitrated but disputes relating to the Company's operation and management would not be arbitrated:

> The Shareholders agree that in the event of a dispute or controversy concerning this Agreement, and/or their relationship to each other as Shareholders, such disputes or controversies shall be submitted to the arbitration of three (3) disinterested and competent arbitrators, whose decision shall be conclusive and binding upon the parties; provided, however, that this arbitration provision does not apply to matters relating to the operation and management of the Corporation, which matters are within the sole discretion of the Board of Directors and not subject to arbitration.[31]

Derivative suits are by their very nature brought against a corporation's directors and officers due to their malfeasance in operating the company – nothing could more directly relate to the operation and management of the corporation as articulated in the arbitration clause. Mark's derivative claims relate to the Company's operation and management: Stephen paid himself exorbitant compensation;  Stephen diverted corporate funds to his friends, children, and to outside companies he owned; Stephen started new corporations competing with the Company; and, the other Defendants supported, enabled, or participated in these decisions.

Defendants argue the exclusion is a narrow carve-that simply intended to exempt "certain matters involving business judgment...[from] arbitral review or second guessing."[32]  Curiously, Defendants argue this carve-out protected the business judgment rule.[33]  Defendants' interpretation both contradicts the plain language of the exception and renders it superfluous.

We find no ambiguity in the phrase "matters related to the operation and management of the company." There is no need to codify the business judgment rule in writing, as it is a presumption officers and directors act in the best interests of the corporation.[34] Defendants' argument fails on its face. Mark's derivative claims fall squarely within the "operation and management" carve-out in the Shareholders Agreement arbitration clause requiring we deny Stephen's motion to compel arbitration on the derivative claims.

Mark's individual unjust enrichment and conversion claims related to the tax refund monies are also fully encompassed within the "operation and management" carve-out. Mark alleges Stephen and the Company failed to return monies received from tax refund checks, made out to Mark personally. Mark alleges someone from the Company forged his endorsement on his refund check and deposited it into a Company account. This behavior constitutes a matter relating to the Company's operations, requiring we deny Stephen's motion to compel arbitration on the individual claims relating to the tax refund check.

Mark's individual statutory claim for minority shareholder oppression against Stephen and the Company presents a closer call. The minority oppression relates to Stephen's operation and management of the Company: denying Mark access to books and records; precluding Mark from meaningfully participating in the Company's "operations"; Stephen's self-dealing by diverting assets to him and affiliates; and depriving Mark of rights and benefits afforded to him as a shareholder.[35] These claims arguably arise from and directly relate to the Company's operations and management. We only need rely upon Mark pleading oppression in the Company's "operations."

Stephen argues these claims arise from their relationship to each other as shareholders and they agreed to arbitrate these claims. Under Stephen's argument, any challenge to Stephen's

management, as it also affects Mark, arises from the relationship as shareholders. We decline to so broadly read the arbitration clause. Mark and Stephen signed a Shareholders Agreement governing the transfer of their shares and post-employment restrictive covenants. These types of transitional provisions are typical for a shareholders agreement in a closely held company. The parties agree claims relating to their roles as officers as opposed to directors would arise from their relationship to each other as shareholders but does not involve "matters…within the sole discretion of the Board of Directors." For example, if President Stephen reduced Vice President Mark's salary, Stephen would properly argue his decision arose from his role as an officer not as a shareholder. Any ministerial day to day decision would also not rise to matters "within the sole discretion of the Board of Directors." In contrast, Mark's individual minority oppression claim challenges actions by a Board of Directors.

Even assuming we found Mark's statutory oppression claim of precluding him from meaningful participation in the Company is not typically within a Board's discretion, we find Stephen and the Company waived the right to arbitrate by litigating these issues in state court for nine months. We may refuse to enforce an arbitration agreement when "a party has acted inconsistently with the right to arbitrate."[36] But waiver of the right to arbitrate "is not to be lightly inferred," given the strong preference for arbitration in federal courts.[37] In fact, waiver is "normally…found only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery."[38] More simply, "prejudice is the touchstone for determining whether the right to arbitrate has been waived by litigation conduct."[39] To "guide the prejudice inquiry," our Court of Appeals offers six factors, often referred to as the *Hoxworth* factors:

> (1) timeliness or lack thereof of the motion to arbitrate; (2) extent
> to which the party seeking arbitration has contested the merits

> of the opposing party's claims; (3) whether the party seeking arbitration informed its adversary of its intent to pursue arbitration prior to seeking to enjoin the court proceedings; (4) the extent to which a party seeking arbitration engaged in non-merits motion practice; (5) the party's acquiescence to the court's pretrial orders; and (6) the extent to which the parties have engaged in discovery.[40]

While the *Hoxworth* factors guide our analysis, they are "nonexclusive and need not all be present to justify a finding of waiver."[41]

Mark, Stephen and the Company litigated in state court for nine months before Mark voluntarily chose to withdraw his those claims, plead RICO and sue other Company fiduciaries and repeat the same state court claims here. Mark's statutory oppression state court allegations with the exception of changing the nomenclature are *verbatim* repeated in this case.[42]

Stephen and the Company decided not to move for arbitration in state court. Instead, they litigated in several motions for nine months and never mentioned their more recent view. We do not find persuasive the notion pursuing those same claims in a separate federal case wipes clean the previous state court litigation from our waiver inquiry.  Stephen and the Company litigated the claims they now argue fell under the arbitration clause well before they arrived here. Ignoring this state court litigation simply because Mark wished to fully assert the Company's and his rights with additional claims and fiduciaries in federal court is unfair and inefficient.  We consider Stephen's and the Company's conduct in state court under *Hoxworth*.

The first *Hoxworth* factor examines the length of time between the beginning of litigation and the motion to compel arbitration.  The signatories litigated for ten months before Stephen and the Company moved to compel arbitration.  Our Court of Appeals found a "ten month delay is significantly longer than the cases in which we have found no waiver[43]  Defendants cite two cases which are not analogous.  In *Serine v. Marshall, Dennehey, Warner, Coleman & Goggin*,

9

Judge Schiller relied on the defendant's plausible explanation for its delay since one of the defendants, later dismissed, was not subject to the mandatory arbitration clause.[44]  In *Aluminum Bahrain B.S.C. v. Dahdaleh*, the court faced a case with no discovery and the eleven month delay created no prejudice.[45]  Here, Stephen and the Company offer no explanation for their delay and, as will be evident later in the analysis, the parties conducted extensive discovery.  We find the first *Hoxworth* factor weighs heavily in favor of waiver.

Next, we examine the extent to which Stephen and the Company contested the merits of Mark's claims before seeking to arbitrate.  While Stephen and the Company filed two sets of preliminary objections and one answer to the state court complaint, these objections did not include "ample briefing," nor did they raise extensive issues outside the scope of the pleadings, as has been the case when our Court of Appeals has found waiver.[46]  We find the second *Hoxworth* factor weighs slightly against waiver.

The third factor asks whether one party informed its adversary of its intent to pursue arbitration.  Stephen and the Company litigated the oppression claim in state and federal court for nine months before moving to compel arbitration.  Our Court of Appeals found a similar delay to weigh heavily in favor of finding waiver.[47]  Stephen and the Company argue they gave sufficient notice by moving for arbitration now.  They actively litigated the oppression claim in state court for months.  We find that this factor weighs in favor of waiver.

The fourth factor examines the extent to which a party seeking arbitration engaged in non-merits motion practice.  The parties engaged in substantial non-merits motions practice in state court.  Stephen and the Company objected to subpoenas and both parties submitted memoranda for each of the numerous objections.  Mark filed at least two motions to compel discovery, one of which succeeded through a June 7, 2016 Order. This conduct during discovery

supports a finding of waiver.[48]   The parties expended much time, effort, and resources in conducting discovery compelling we find the fourth factor weighs in favor of waiver.

The fifth *Hoxworth* factor considers the parties' assent to pretrial orders. Stephen and the Company assented to the state court's orders by providing discovery following Mark's successful motion to compel, appearing at oral argument for preliminary objections, and entering into a joint stipulated confidentiality order. The fifth factor supports waiver.

We lastly examine the extent of discovery in state court.   The parties engaged in substantial discovery.  The parties exchanged thousands of documents related to the Company and Stephen's ownership of other entities.  Mark issued interrogatories and document requests and Stephen responded.   The parties litigated Mark's motion to compel. Stephen and the Company objected to several subpoenas resulting in briefing.  This level of discovery weighs heavily in favor of waiver.[49] Stephen and the Company argue Mark cannot be considered prejudiced because he improved his position through discovery in state court.  This argument misses the definition of prejudice, which focuses on the expenses incurred by the nonmoving party in discovery before its adversary attempted to move the case to arbitration.[50]  This concept fits neatly with the often false hope of arbitration, meant to conserve resources for the parties and the judiciary.  It does not matter how discovery affected Mark's position; we only review Mark's expending resources to conduct discovery during litigation before Stephen and Company moved to compel arbitration. The sixth and final factor weighs heavily in favor of waiver.

Our final scorecard for the *Hoxworth* factors weighs heavily in favor of Stephen and the Company waiving the ability to now arbitrate the minority oppression claim litigated in state court. We reject Defendants' attempt to argue we should not find waiver because the "evaluation of a party's litigation conduct in the context of ...waiver...effectuates the principle that a party

11

may not use arbitration to manipulate the legal process and in that process waste scarce judicial resources."[51]   But this is exactly what Stephen and the Company did when they aggressively litigated the minority oppression claim in state court for nine months – they filed numerous preliminary objections and objections to subpoenas, conducted extensive discovery, fully briefed a plethora of disputes, entered into stipulated confidentiality agreements, and attended oral arguments.  Stephen and the Company "use[d] arbitration and manipulate the legal process and in that process waste[d] scarce judicial resources," without once mentioning the prospect of arbitration, a fact for which they have no explanation.

Stephen and the Company "act[ed] inconsistently with the right to arbitrate."[52]   Stephen and the Company waived their right to arbitrate Mark's minority shareholder oppression claim.

### B.      We deny Mark's motion to disqualify the Company's counsel.

Plaintiff separately moves to disqualify Stephen's counsel from representing the Company, while also representing the individual defendants.  We have the inherent power to supervise the conduct of attorneys practicing before us.[53]   We may disqualify counsel appearing before us.[54]   The party seeking disqualification bears the burden to show that the representation is impermissible.[55]   We balance competing interests and disqualify a client's chosen counsel after considering the disciplinary rule's purposes. The Pennsylvania Rules of Professional Conduct provide:

> a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
> (1) the representation of one client will be directly adverse to another client; or
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Pa. R.P.C. 1.7.

Derivative actions, such as this one, present difficult questions as to when counsel can represent both the entity and individual defendants alleged to harm the entity.[56]  Again thanks to the parties' decisions in the state court, we need not wade into these difficult questions today. Mark waived his present argument.

"[W]aiver is a valid basis for the denial of a motion to disqualify."[57]  When determining whether the moving party waived his right to object to opposing counsel's representation, we consider the length of delay in bringing the motion to disqualify, why the delay occurred, whether movant was represented by counsel during the delay, when the movant learned of the conflict, and whether disqualification would prejudice the nonmoving party.[58]  Judge Dalzell, when applying this analytical framework, found a nine month delay in filing a motion to disqualify while the movant was "represented by highly sophisticated counsel for that entire period" to constitute waiver.[59]

Mark waived his right to object to opposing counsel's representation of the individual defendants and the Company by litigating a substantially similar action in state court for nine months before voluntarily withdrawing his state court case and filing this federal suit.  While the state court attorneys for Stephen and the Company are not the same attorneys as those in this matter, the conflict any defense counsel had representing both the Company and the individual defendants is identical.  Mark knew the state court defense counsel entered their appearances for both Stephen and the Company.  At all times throughout both the state and federal litigation, able experienced counsel represented Mark, though his attorneys here differ from the ones representing him in state court.  Defendants are prejudiced by disqualification at this stage of the litigation, as either the individual defendants or the Company would be forced to quickly find

new counsel and to get up to speed on this case. These factors overwhelmingly require our finding Mark waived his right to object to Stephen's counsel's representation of the Company. We deny his motion in the accompanying Order.

### III.   Conclusion

Mark and Stephen fought regarding their Company's management before bringing their dispute to state court. They spent substantial fees and litigated several key issues in state court without raising either arbitration or a disqualifying conflict of interest. They had the opportunity do so but elected not to do so. Both parties have spent money and time. Stephen waived the arbitration argument and Mark waived the disqualification request.   We deny both motions in the accompanying Order.

---

[1] ECF Doc. No. 1, ¶16.

[2] *Id.* at ¶¶ 17-18.

[3] ECF Doc. No. 1-13 at ¶¶ 19-21.

[4] *Id* at ¶ 19.

[5] ECF Doc. No. 1-3 at ¶ 14.

[6] ECF Doc. No. 1 at ¶ 23.

[7] ECF Doc. No. 1 at ¶¶ 23-25.

[8] *Id.* at ¶ 57.

[9] *Id.* at ¶ 42.

[10] *Id.* at ¶¶ 47-52.

[11] Id. at ¶¶ 73-106.

[12] *Id.* at ¶¶ 107-115, 131-140, 158-162.

[13] *Id.* at ¶¶ 119-130.

[14] *Id.* at ¶¶ 144-157, 163-170.

[15] ECF Doc. No. 25-7.

[16] ECF Doc. No. 22-8.

[17]   As detailed in our accompanying Order, Mark voluntarily withdrew an individual claim for alleged identity theft of his name to garner New Jersey business for the Company.  Mark also agreed to dismiss his individual "fraud", "fiduciary duty" and "unjust enrichment" claims as being duplicative of the Company's existing fiduciary duty claim and his minority oppression statutory claim.

[18] Our Court of Appeals offers "split pronouncements" on the standard for deciding a motion to compel arbitration.  *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 773 (3d Cir. 2013).  First, "[w]here the affirmative defense of arbitrability of claims is apparent on the face of a complaint…or…documents relied upon in the complaint," courts should resolve motions to compel arbitration "under a motion to dismiss standard without the inherent delay of discovery. *Id.* at 774 (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 481-82 (E.D. Pa. 2011)).  "But if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue," then the Court should decide the motion to compel using the summary judgment standard after allowing for a brief period of discovery on the question of arbitrability.  *Id.* at 776.   Both parties argue the motion to dismiss standard is the appropriate standard of review claiming Mark relies on the Shareholders Agreement.  *See Somerset*, 832 F. Supp. 2d at 482 (finding a motion to compel arbitration should be decided using the motion to dismiss standard of review when the agreement with the arbitration clause forms the basis of the plaintiffs' claims and the plaintiffs had attached the agreement to their complaint).
　　We disagree.  Mark's claims admittedly do not arise under the Shareholders Agreement. The Shareholders Agreement addresses transfer of ownership interests and post-employment restrictive covenants.  This suit is predominated by alleged breaches of fiduciary duty to the Company and, to the extent it can be shown after discovery, some form of racketeering through the Company also victimizing the Company.  No party argues ambiguity or some fact dispute concerning whether Mark and Stephen agreed to arbitrate certain disputes.  The questions facing us are legal: whether the unambiguous arbitration provision applies to any of Mark's claims.  As there are no issues of fact requiring discovery, we now review the motion to compel arbitration under the summary judgment standard of whether, as a matter of law, the arbitration provision mandates dismissal.

[19] *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 528 (3d Cir. 2009)).

[20] *Century Indem. Co.*, 584 F.3d at 527.

[21] *Rite Aid of Pennsylvania, Inc. v. United Food & Commercial Workers Union, Local 1776*, 595 F.3d 128, 131–32 (3d Cir. 2010).

[22] *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999).

[23] *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 627 (1985).

[24] *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 478 (1989).

[25] *Kamen v. Kemper Financial Services*, 500 U.S. 90, 95 (1991) (internal citations and quotations omitted).

[26] *Ross v. Bernhard*, 396 U.S. 531, 538 (1970) (quoting *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522 (1947)).

[27] *See Hill v. Ofalt,* 85 A.3d 540, 549 (Pa. Super. 2014).

[28] *Id.*

[29] *Id.* at 550.

[30] *In re Salomon Inc. Shareholders' Derivative Litig. 91 Civ. 5500 (RRP)*, 68 F.3d 554, 557 (2d Cir. 1995); *Etzler v. Etzler,* No. 2288 EDA 2014, 2015 WL 7253636, *4 (Pa. Super. Nov. 17, 2015) (derivative claim arbitrable in a dispute over stock value in a shareholder buyout required by a shareholders agreement).

[31] ECF Doc. No. 1-3 at ¶ 14.

[32] ECF Doc. No.20-2 at 17.

[33] *See In re Lemington Home for Aged,* 659 F.3d 282, 291 (3d Cir. 2011) ("Pennsylvania law provides that '[a]bsent breach of fiduciary duty, lack of good faith or self-dealing, any act as the board of directors, a committee of the board or an individual director shall be presumed to be in the best interests of the corporation.'").

[34] *Id.* at 292.

[35] ECF Doc. No. 1, ¶ 205.

[36] *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 208 (3d Cir. 2010).

[37] *Id.*

16

[38] *In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d 109, 117 (3d Cir. 2012) (quoting *Nino*, 609 F.3d at 208).

[39] *Zimmer v. CooperNeff Advisors, Inc.*, 523 F.3d 224, 231 (3d Cir. 2008).

[40] *Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 451 (citing *Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 926-27 (3d Cir. 1992)).

[41] *In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d at 118 (quoting *Nino*, 609 F.3d at 209).

[42] ECF Doc. No. 17-4, Count III.

[43] *In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d at 118; *see also Gray Holdco*, 654 F.3d at 454 (finding a ten month delay favored a finding of waiver); *Hoxworth*, 980 F.2d at 925 (eleven months); *Nino*, 609 F.3d at 210 (fifteen months).

[44] No. 14-CV-4868, 2015 WL 46444129, at *3 (E.D. Pa. Aug. 5, 2015).

[45] 17 F. Supp. 3d 461, 476-77 (W.D. Pa. 2014).

[46] *Compare In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d at 118 (ample briefing in motions to dismiss coupled with issues raised outside the pleadings favored a finding of waiver) *with Hoxworth*, 980 F.2d at 925-26 (a motion to dismiss and opposition to a motion for class certification did not favor finding of waiver).

[47] *See Gray Holdco, Inc.,* 654 F.3d at 459.

[48] *See Hoxworth*, 980 F.2d at 925 (finding considerable effort and expense in conducting discovery supported waiver); *Nino*, 609 F.3d at 212 (motions practice, including plaintiff's filing of motions to compel after inadequate responses, evidenced substantial time, effort, and resources in conducting discovery that supported a waiver finding).

[49] *See Nino*, 609 F.3d at 213 the sixth *Hoxworth* factor supported waiver when the parties issued interrogatories, served and supplemented disclosures, and exchanged requests for document production).

[50] *See Nino*, 609 F.3d at 213 (discussing the expending of resources during discovery without mentioning the effect of discovery on the sides' legal positions).

[51] ECF Doc. No. 32 at 3 (quoting *Gray Holdco, Inc.*, 654 F.3d at 453-454).

[52] *Nino*, 609 F.3d at 208.

[53] *See, e.g., Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F.Supp. 1200, 1203 (E.D. Pa. 1992) (citing *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 161 (3d Cir. 1984)); see also Local R. Civ. P. 83.6 (practice before courts of this district are governed by the Pennsylvania Rules of Professional Conduct).

[54] *See, e.g., United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980) (discussing standards for attorney disqualification).

[55] *See James v. Teleflex, Inc.*, No. 97-1206, 1999 WL 98559 at *3 (E.D. Pa. Feb. 24, 1999) (under Rules 1.7 and 1.9).

[56] While our Court of Appeals has held in derivative actions, "allegations of directors' fraud, intentional misconduct, or self-dealing require separate counsel," such cases have examined attorney conflicts in the context of derivative suits against large corporations. *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1317 (3d Cir. 1993). While we do not face the issue today, we do not see a significant difference between disqualifying conflicts regardless of the size or diversity of entity ownership. Serious questions of loyalty to the client are triggered whenever one client is sued for harming another client. There is a dearth of case law from our Court of Appeals on derivative suits involving closely held corporations, but are aware of our esteemed colleague Judge Padova's opinion in *Abramsky v. Zmirli*, No. 12-6382, 2013 WL 373274, *4 (E.D.Pa. Jan. 31, 2013) and views from other Districts and the Pennsylvania Bar Association Committee on Legal Ethics and Professional Responsibility ("PBA Ethics Committee"). In *Amramsky*, Judge Padova required separate counsel when counsel admitted it may have a conflict of interest and the plaintiffs consented to separate counsel for a limited liability company. We are not blessed with these admissions. In *Obeid ex rel Gemini Real Estate Advisors v. La Mack*, No. 14-6498, 2015 WL 7180735 (S.D.N.Y. Nov. 9, 205), Magistrate Judge Dolinger denied plaintiff's motion to disqualify defense counsel from representing both a closely held corporation and two of its three shareholders in a derivative action finding, "when the company in question is closely held...additional practical considerations suggest caution in approaching a disqualification motion."[56] He noted three principals owned and controlled the defendant corporation and the two defendants would have the power to choose any replacement attorney who would then be subject to their direction. Judge Dolinger relied heavily on the reasoning in *Evans v. Perl*, No. 602898/05, 2008 WL 1735059, *3-5 (Sup.Ct.N.Y.Cty. Apr. 9, 2008) where Judge Gische found since closely held corporations usually had "no independent corporate governance from the management whose actions are being challenged...the absence of independent counsel will not affect the ferreting out of wrongdoing...by those in control." The PBA Ethics Committee reached a similar conclusion in a 1999 informal opinion, finding counsel may jointly represent a closely held corporation and its controlling shareholders when independent counsel represented the non-controlling shareholder's interests. Informal Op. 99-105, 1999 WL 1458357. We leave this decision to another day when the parties have not waived their objection.

[57] *Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F. Supp. 1200, 1208 (E.D. Pa. 1992).

[58] *Id.; see also In re Rite Aid Corp. Sec. Litig.*, 139 F. Supp. 2d 249, 660-1 (E.D. Pa. 2001).

18

---

[59] *In re Rite Aid Corp. Sec. Litig.*, 139 F. Supp. 2d at 661.